**E-FILED**
Monday, 24 September, 2012  03:33:56 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

**FILED**

SEP 24 2012

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| Junhao Su | ) | CASE NO. 12-2248 |
| Plaintiff | ) | |
| | ) | |
| -vs- | ) | JUDGE _____ |
| | ) | |
| Eastern Illinois University | ) | COMPLAINT |
| Defendant(s) | ) | |

1. This is an action arising under the laws of the United States, in particular Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000d et seq. ("Title VI"). Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, Title VI, and/or 42 U.S.C. § 1983.

2. Claims also are stated under the laws of the State of Illinois against the defendant.

3. The supplemental jurisdiction of this Court is invoked pursuant to 28 USC § 1367 over the State law claims which are so related to federal claims in the action that they form part of the same case or controversy under Article III of the United States Constitution.

4. Plaintiff, Junhao Su, has been a resident in Jefferson County of the State of Illinois and alleges that his civil rights were violated by the defendant named below.

5. Defendant, Eastern Illinois University, is a public institution of higher education operated by the State of Illinois and receiving federal financial assistance, and maintains an office and a place of business in Coles County, State of Illinois.

6. In March, 2012, plaintiff discovered that defendant's denying his fall 2011 semester admission into its Master in Clinical Counseling program was due to plaintiff's race, Asian, and national origin, Chinese, and particularly, in retaliation of plaintiff's filing national origin (Chinese) education and employment discrimination complaints in 2008 at his previous public institution, Bowling Green State University (BGSU) in Ohio, and subsequently being retaliated for filing the national origin (Chinese) education and employment discrimination at BGSU by his second public institution, Florida International University (FIU) in Florida and BGSU.

7. This also is an action under the laws of the State of Illinois for Intentional Infliction of Emotional Distress, Illinois Consumer Fraud and Deceptive Business Practices Act, Breach of Fiduciary Duties, and Negligence.

8. Plaintiff was born in the People's Republic of China. He is Asian, and of Chinese national origin.

9. (1) Between January and February, 2011, plaintiff called defendant's Counseling Master's program department secretary, Ms. Debbie Gerdes ("Ms. Gerdes"), two times

on two separate days, inquiring about the receipt of plaintiff's application for admission

documents for the clinical counseling Master's program. Initially, Ms. Debbie was

friendly to plaintiff, and sounded normal. However, the second time when plaintiff called

Ms. Debbie, Ms. Debbie at first asked plaintiff, *at this time still sounded normal*, "so

have you checked with the Graduate School to see if they have received your documents

there? They have to process your documents first, and then they will forward them to us."

Plaintiff said, "I contacted them and they said that they have forwarded my documents to

the International Program's office." Upon hearing that, Ms. Debbie's *attitude*

*immediately changed*, from normal to nervous and *even mildly hysterical*, and asked

plaintiff, "are you a U.S. citizen?!" Plaintiff was confused about her sudden attitude

change, so said, "excuse me?" Ms. Debbie repeated, continuing to be nervous and mildly

hysterical, and even somewhat hostile, "you are still not a U.S. citizen?!" Since that was

an irrelevant question regarding admission, plaintiff said, "they just told me that they

have forwarded my documents to the International Program's office."


(2) Information regarding Ms. Gerdes' reactions to plaintiff in paragraph 9 (1) above, to

prove that defendant's knowledge *from BGSU* of plaintiff's past national origin

employment and education discrimination complaints and plaintiff's subsequent

experiences (retaliated) *prior to* plaintiff's applying for admission into defendant's

counseling program: *a few days after* plaintiff was constructively discharged from BGSU

in early 2010, at 04:22 pm, on Thursday, February 04, 2010, *instead of* contacting

plaintiff from the Center for International Programs, people of whose office processed

plaintiff's transfer from BGSU to FIU in later summer 2008, which caused plaintiff's

career to be sabotaged by BGSU immediately post that transfer, Ms. Susan Gladieux ("Ms. Gladieux") from *BGSU's Career Center* (*the Career Center had never contacted plaintiff voluntarily to offer services to plaintiff*) contacted plaintiff regarding his citizenship option in his WorkNet (BGSU's internal job-hunting portal), suggesting that plaintiff's first choice would be U.S. citizen. Plaintiff noticed that it was shown on his BGSU WorkNet as U.S. Citizen or Permanent Resident. That information was communicated from BGSU to various institutions that it had communicated regarding plaintiff's complaints experiences, including defendant. BGSU believed that plaintiff was already a U.S. citizen. When Ms. Gerdes learned from the phone that plaintiff's application documents were forwarded to the International Office, she was surprised because the information she had received from BGSU was not consistent with what she had just learned from defendant's related office.

10. (1) Defendant did receive plaintiff's complete application for admission documents for its clinical counseling Master's program before the deadline, as evidenced by defendant's inviting plaintiff for the second stage of the admission: on-campus interview. Only applicants meeting the initial admission requirements were invited.

(2) *However*, defendant did not contact plaintiff regarding inviting plaintiff for the interview until *right after* plaintiff faxed his *signed* letter (legally actionable and Dr. Roberts certainly was well aware of that) to Dr. Richard Roberts ("Dr. Roberts"), the clinical counseling Master's program Coordinator, inquiring *again* (initial statement already attached in plaintiff's application package) whether his unofficial GRE score

could be considered since it was only a little bit older than 5 years and *emphasized* with *underline in that faxed signed letter* that supporting documents for plaintiff's *exceptional* situation will be provided (reason for having to submit GRE score a little bit older than 5 years: plaintiff's past career damage experiences due to his national origin discrimination complaints). Only after plaintiff faxed the *signed* letter to Dr. Roberts on February 28, 2011 did Dr. Roberts call plaintiff, and told plaintiff that he would accept plaintiff's unofficial GRE score, and asked plaintiff to send him an email regarding this request. Plaintiff said, "the timing seems just right." Upon hearing plaintiff's mentioning "the timing," Dr. Roberts suddenly sounded somewhat nervous, and immediately asked plaintiff, "what do you mean by timing?" Plaintiff explained to Dr. Roberts that he had just faxed the documents and then Dr. Roberts called, while plaintiff's complete application package was processed by defendant much earlier (in early February at least). *Upon hearing* that plaintiff was talking to him nicely and with smile, Dr. Roberts *imitated plaintiff* and started to sound nice and mildly smiled, too, making him *appear* appreciating plaintiff and even personable to plaintiff. Plaintiff did send Dr. Roberts the email that Dr. Roberts requested. After Department of Education Office for Civil Rights ("OCR") investigated EIU's alleged national origin education discrimination and retaliation complaint filed by plaintiff, plaintiff discovered that Dr. Roberts' agreement to accept plaintiff's a little bit older GRE score did not at all mean that Dr. Roberts' was favoring plaintiff, as evidenced by what Dr. Roberts told OCR, "I have waived this requirement in the past *for other applicants*; test scores are a small part of the written component of the application so I generally accept older scores if they were received within 5-10 years (which was plaintiff's situation); I may not if they were really dated

(e.g. 20+ years)." Therefore, it was plaintiff's signed letter faxed to Dr. Roberts that

made Dr. Roberts have to invite plaintiff to the interview, because plaintiff's admission

records were too strong not to be invited. In other words, if Dr. Roberts had not invited

plaintiff, especially after receiving plaintiff's signed letter, Dr. Roberts knew that

defendant would have been much more easily to lose the national origin/racial

discrimination/retaliation lawsuit because that rejection would have been too obvious,

meaning too easy to prove in Court.

(3) On the next day, March 1, 2011, the program secretary, Ms. Gerdes, emailed plaintiff,

the invitation for the on-campus interview. The potential interviewees' *response deadline*

(indicating to EIU whether or not they would like to attend the on-campus interview) was

*the same day (March 1)*. Since Ms. Gerdes *just* contacted plaintiff, she had to extend the

deadline of response to plaintiff to March 3, 2011. This is another clear and convincing

evidence to prove that defendant had not planned on even inviting plaintiff to the

interview. Plaintiff would not have known then defendant's that plan until after OCR's

investigation. Plaintiff confirmed attendance of the interview, and did attend the

interview on March 7, 2011.

11. Between January and early April, 2011, plaintiff contacted various on-campus offices (at

least 10) at defendant to submit his materials for a Graduate Assistantship (merit-based

funding) position for the period when he would pursue his Counseling studies (this

process had to start as early as then). After plaintiff discovered in early March, 2012 that

defendant provided various untrue information to OCR, plaintiff realized that at that time

(between January and early April, 2011), some of the people that plaintiff contacted (their names and related documents available) had also already known of plaintiff's past national origin discrimination complaints and subsequent experiences (career terminated, for instance) and apparently had already known that plaintiff would not be admitted by defendant, but none of them provided this truth to plaintiff, and still pretended to sound that they would consider plaintiff's materials for the positions.

12. Between mid and late March, 2011, plaintiff received notification from defendant that his admission into defendant's Master in clinical counseling program was denied. In fact, *only 3 days after* the on-campus interview did Dr. Roberts already issue plaintiff the admission denial letter, which was dated March 10, 2011. Given the number of Master's applicants (at least 60), and the amount of evaluation materials (writing sample, for instance), and the workload of faculty members during the semester, it would not be normal to make the decision that quickly. Obviously, defendant had already pre-determined not to admit plaintiff, before having to invite him to the interview, and the interview was just a nominal procedure that defendant had to take.

13. On April 6, 2011, plaintiff contacted Ms. Marilyn Thomas ("Ms. Thomas") at defendant's international program's office to inquiry about the reason for denial, who directed plaintiff to contact the program Coordinator, Dr. Roberts, directly for the denial reason. Plaintiff initially called Dr. Roberts a couple of times but did not get any answer, so plaintiff left him a voicemail with a call back number but Dr. Roberts never called back. As a result of that, plaintiff emailed Dr. Roberts asking for the reason for denial

admission. Dr. Roberts did not reply until plaintiff re-sent his email twice to him. Only

after that did Dr. Roberts finally respond to plaintiff, but with a vague answer: "compared

to other applicants for the *limited student slots available*, you were *not as competitive* in

the areas of experience, writing sample and interview." After complainant asked him,

"could you please be more specific?" Dr. Roberts responded, "I can't be more specific."

14. After plaintiff spent quite some time carefully reviewing his application materials and his

related documentation regarding his application experiences at defendant, plaintiff

definitely did not agree that he should be denied admission. In fact, based on plaintiff's

observation of other applicants in his interview group, and his past graduate school

training experiences in both Master's and Doctoral programs in related field, plaintiff

believed that he was definitely qualified for admission, and even better qualified.

15. Based on plaintiff's past experience: when plaintiff transferred from BGSU to FIU, even

though plaintiff was severely damaged career wise and mentally because the ongoing

national origin discrimination at BGSU elevated from ongoing verbal abuse to the level

of depriving plaintiff's degree and stalking, plaintiff still decided to move on with his

career at FIU and maybe find another time to try to finish his degree at BGSU; *however*,

BGSU, even though being aware that plaintiff was the victim of the sensational ongoing

national origin harassment and crimes (fraud, repeated stalking, etc), still chose to

sabotage plaintiff's career by *harassing* plaintiff to FIU, sending FIU false and

misleading information about plaintiff, to cover up the scandal at BGSU and to ruin

plaintiff's career so as to get away from this scandal. Had plaintiff realized the sabotage

from BGSU then, plaintiff would have immediately filed the complaints externally, instead of filing the internal complaints as suggested by his counselor at BGSU, even though plaintiff understood that the counselor was trying to assist plaintiff genuinely then. Therefore, *this time*, plaintiff decided to quickly file the education discrimination based on national origin and retaliation complaint against defendant to OCR. Plaintiff did it on September 13, 2011, shortly after getting Dr. Roberts' vague reason for denying plaintiff's admission and after careful review of the related documents. Plaintiff decided to also take this opportunity to further educate defendant, as well as other potential institutions, of the malicious manipulation by BGSU that caused not only plaintiff to continuously suffer, but also other institutions to be possibly negatively affected, in this case, already affected, due to the false and misleading information BGSU initially spread out.

16. OCR completed its initial investigation on March 9, 2012 into the alleged education discrimination based on national origin (Chinese) and retaliation because of plaintiff's complaining of national origin (Chinese) education and employment discrimination in his previous institution, BGSU. Plaintiff spent quite some time reviewing the investigation report and collecting more evidence, and discovered that, based on the false and inconsistent information that defendant provided to OCR, plaintiff was indeed discriminated against by defendant based on his race, Asian, *and* national origin, Chinese, and particularly, was retaliated against because of plaintiff's filing the national origin education and employment discrimination complaints at his previous institution, BGSU,

and subsequently being retaliated by BGSU and FIU because of filing the complaints at BGSU.

17.  Plaintiff submitted his discoveries (inconsistencies, for example, of defendant's responses to OCR and to plaintiff) and supporting documentation to OCR headquarters on May 8, 2012, for consideration. Meanwhile, plaintiff decided to file this suit to federal district court so as not to delay any valuable time this time.

18. In the following paragraphs, plaintiff states the facts, and the false, inconsistent, and problematic information that defendant provided to OCR during OCR's investigation (all stated in OCR's investigative report), which all support plaintiff's allegations in this Complaint.

19. (1) *Only recently* (since 2009 or 2010) did defendant start to make promotion video about its Counseling program, in which faculty members and applicants were required to dressed up *in suits*, particularly emphasizing *professionalism*. Counselor educators wear suits like business persons. The video may be viewed from http://www.eiu.edu/csd/ms_in_student_affairs_csa_days.php

(2) Regarding the "professionalism" emphasis mentioned in paragraph 19 (1) above: In 2008, plaintiff complained about aggravated national origin (Chinese) harassment (malicious laughing at plaintiff for a long time) from Dr. Philip Xie, who was directly responsible for plaintiff's not graduating at his first institution, BGSU (a member of the Midwestern Association of Graduate Schools ("MAGS")), far beyond the limit of merely

being unprofessional. Shortly after that, that harasser's profile picture on BGSU website was changed to one in which he was wearing a tie and suit, appearing more "professional," different from his previous more casual picture. Similarly, shortly after plaintiff was terminated from his career at his second institution, FIU, its faculty members in the Psychology Department (where plaintiff was studying and working) were taken new profile pictures in which they appear more "professional," different from their previous more casual pictures. Still similarly, defendant's counseling department (plaintiff's career path, which was a focal point of plaintiff's national origin discrimination complaint) produced promotional videos where *counselors* were dressed up in suits, overly and bizarrely emphasizing "professionalism."

(3) Regarding the academic area of "counseling" mentioned in paragraph 19 (1) above: In 2009, in a letter plaintiff sent to his FIU's advisor, plaintiff stated that his career passion was in psychology and counseling. Universities have a system that share important information, so does the field of psychology. That plaintiff's doctoral career was terminated at FIU was not a small issue, particularly it was due to his national origin discrimination complaint and he was on merit-based funding. FIU shared that letter with BGSU in summer 2009. Psychology and counseling were identified as plaintiff's passion in that letter. As a result, the places for BGSU to contact to further block plaintiff's academic career so as to achieve BGSU's ultimate goal of retaliating plaintiff, because he filed the national origin employment and education discrimination complaints, would be counseling and psychology graduate program *directors* (the person that makes the major decision on who to admit; in defendant, this person is Dr. Roberts, who happened to be

white American), continuing its pattern of sabotaging plaintiff's career. Particularly, BGSU was aware of plaintiff's Illinois residence, which is not far from defendant, *and* plaintiff's past M.O.: *moving on to other institutions* for his academic career in counseling/psychology.

(4) Given the timing and sequence of these events (plaintiff complained at BGSU for aggravated national origin (Chinese) harassment in 2008, and his career terminated at FIU at the end of 2008, and then in 2009 or 2010, BGSU, FIU, and defendant, started to emphasize professionalism, particularly in counseling and psychology) *and* the nature of them (all professionalism), BGSU turned plaintiff's complaint for aggravated national origin harassment into its own benefits and mis-stated the fact to its conspired institution, FIU, as well as other institutions via Department of Education, at least in the *Midwest area* (since BGSU is also a member of the MAGS), that its Chinese student alleged unprofessionalism from faculty members, covering up the fact that it was actually aggravated national origin harassment, misleading others into believing that plaintiff was a "perfectionist," accusing of anything, while in fact, the national origin discrimination and harassment was so frequent, common, and severe at BGSU that it caused plaintiff's degree to be deprived, as manipulated by his advisor, Dr. Julie Lengfelder, who happened to be a graduate from Southern Illinois University Carbondale, the same graduating university as some faculty members at defendant's Counseling program. The most apparent fact, if not the only, is that counselor educators and applicants for counselors at defendant recently were required to wear suits like businesspersons to emphasize professionalism. This is not normal and out of the ordinary.

20. (1) During the interview for fall 2011 Counseling applicants, which was held on March 7, 2011, Dr. Roberts, program coordinator, said to all invited applicants that *their faculty members got along very well because they needed to maintain their mental health*. Dr. Roberts did not provide related documents to OCR to prove that he made this statement in the past 10 years (as what he told OCR during OCR's investigation), particularly prior to 2008. He explained to OCR that "it is an easy statement to make" and the purpose was to tell students that their culture was healthy. Dr. Roberts did not tell OCR, nor could he likely, *how he knew* that the reason for their faculty's getting along with each other *was because* they wanted to maintain their own mental health. It is highly impossible that faculty members in his Department would tell him that they got along with each other because they needed to maintain their mental health. In reality, students in the graduate level are *more concerned about* faculty's availability, research and *friendliness to students*. Dr. Roberts emphasized their faculty's getting along *with each other, and that the reason for that was for their mental health concern*. This sentence per se immediately revealed that at least Mr. Elliott in the Graduate School had told him about what plaintiff had told him regarding being the scapegoat of faculty fights at BGSU, which was part of plaintiff's national origin discrimination complaints, during their December 2, 2010 talk (Compl.: 23). During plaintiff's previous interviews at other graduate programs, he had never heard program directors *deliberately* talking about their faculty's getting along with each other. In fact, deliberately emphasizing this area may even cause students to think that their faculty members might not get along with each other and that there might be problems in this area and that was why he deliberately mentioned that area. Regardless of

the reason Dr. Roberts gave, the fact that he mentioned that sentence is proof that he was aware of plaintiff's BGSU's national origin discrimination complaints before the admission process, as least told by Mr. Elliott from defendant's Graduate School.

(2) Regarding Dr. Roberts' comment in paragraph 20 (1) above: (A). "To maintain their mental health:" In BGSU, plaintiff started his mental health counseling Master's program since his second academic year, fall 2007, at BGSU, not only because his first Leisure and Tourism program at BGSU (started from fall 2006) was *forced* to stop due to the conspired fraud committed by three faculty members in that School but also because he enjoyed studying counseling. Together with his national origin employment and education discrimination complaints against certain faculty members in his Leisure and Tourism program at BGSU and the fact that his Leisure and Tourism program was forced to stop (plaintiff's academic advisor *said* that she still wanted to help plaintiff but her *actions turned out to be just the opposite*), it is relatively more easily perceived by outsiders that plaintiff felt so mentally polluted in his first program at BGSU that he left that program to study mental health counseling *to maintain his mental health* (plaintiff's purpose was to also pursue his degree and career in counseling regardless of the national origin discrimination in his Leisure and Tourism program, while BGSU, post-complaint, falsified plaintiff's admission year to BGSU's Counseling program from 2007 to 2008 to falsely state that plaintiff's felt mentally polluted so started to *take mental counseling courses* to maintain his mental health, thus committing "conflict of interest," with the ultimate purpose of covering up the conspired fraud that *forced* his first Leisure and Tourism program to stop from plaintiff's second academic year at BGSU). (B). "Faculty

getting along with each other:" on December 2, 2010, prior to applying for the counseling

program at defendant, plaintiff told the Assistant Dean of the Graduate School of

defendant, Mr. William Elliott ("Mr. Elliott"), in person that plaintiff became the

scapegoat of two faculty members' (Dr. Julie Lengfelder and Dr. Geoffrey Meek) fight

with each other (did not get along with each other) at his Leisure and Tourism program at

BGSU. Upon hearing the "scapegoat" concept, Mr. Elliott's eyes became wide-open,

having the typical "knee-jerk" reaction. Apparently, Mr. Elliott did not expect that

plaintiff, a China-born applicant, could even identify this quite hidden phenomenon in the

American academia field. Regardless of what reasons given for mentioning their faculty

members got along with each other for the sake of their mental health, Dr. Roberts'

talking about this area in the welcome meeting is evidence that Mr. Elliott had told Dr.

Roberts about plaintiff's national origin discrimination complaints and his related

experiences (scapegoat of faculty fight) at his previous two institutions prior to the

admission process.

21. (1) During the welcome meeting for fall 2011 Counseling applicants, which was held on

March 7, 2011, Dr. Roberts said that, in their program, if they (faculty members) thought

that any student had problems, they would first send that student a letter and have a talk

with him/her about the problem. After that, if they still thought that that student had

problems, they would dismiss him/her from the program.

(2) Regarding the "before dismissing a student, first sending a letter" concept mentioned

above: during the forced terminating plaintiff's career meeting at FIU on December 1,

2008, when plaintiff challenged his bosses, particularly Dr. Robert Lickliter ("Dr.

Lickliter"), the director of the graduate program, for terminating his career *at the last*

*minute* without talking to plaintiff immediately after they saw those "problems" that they

gave verbally for terminating plaintiff's career, Dr. Lickliter apparently realized that he

was wrong: upon hearing plaintiff's that challenge, he made the sound "si----------" and

immediately started to look at the ceiling and seemed to have realized something.

(3) On December 19, 2011, plaintiff faxed OCR a list of information for OCR to question

related persons at defendant, which includes this comment by Dr. Roberts mentioned 21

(2) above. Among OCR's investigation files, there was no answer from Dr. Roberts

regarding his this comment. Department of Education, which provides funding to FIU,

received FIU's suggestion after FIU wrongfully terminated plaintiff's career in December,

2008, with FIU stating that in order to avoid being fined or sued by students, program

director, before terminating a student's career, needs to send a written document stating

the problem that the program director believes that the student has. However, FIU's this

last-minute firing plaintiff's action was another mirrored retaliatory action because

plaintiff submitted his national origin discrimination complaints *in the last summer* at

BGSU, which immediately caused the Graduate Coordinator for his Leisure and Tourism

program at BGSU, Dr. Geoffrey Meek (one of the national origin discrimination

offenders), to be terminated from the Coordinator position (the "last-minute" concept that

BGSU wrongfully communicated to FIU). Department of Education disseminated such

information submitted by FIU to other programs that it funds, particularly psychology

and counseling programs where plaintiff's career was terminated to avoid similar

problems from happening again. In addition, terminating a minority doctoral student's doctoral career, especially when that doctoral student was on merit-based funding is not a small issue in the U.S. higher education, particularly it was a blatant conspired retaliation situation, resulting in complainant's both master's and doctoral career to be damaged. The academia is a small circle. In the psychology and counseling graduate level, program directors had already shared, prior to plaintiff's applying for admission into defendant's counseling program, plaintiff's experience to avoid similar issues from occurring in the future. Dr. Roberts and some of its senior faculties, particularly white faculty members (since racial/national origin discrimination is involved), are among them.

22. (1) Shortly after defendant denied plaintiff's admission, on April 28, 2011, *BGSU* announced that its Graduate School was about to terminate a few graduate programs (document available). Plaintiff stated clearly to Mr. Elliott, both during the phone talk with him prior to visiting him on December 2, 2010, *and* at the start of the meeting with him on December 2, 2010, that plaintiff's *purpose of visit* was to talk to the *Dean of EIU Graduate School*, who is also the member of the Graduate School Council ("GSC"), to complain to the GSC against the two institutions, BGSU and FIU, that discriminated against plaintiff based on his national origin and retaliated against plaintiff because plaintiff complained about the national origin discrimination. That BGSU at that time announced that it might eliminate or suspense some graduate programs (not undergraduate programs) there and the cause of that was diversity issue is evidence that Mr. Elliott informed BGSU of plaintiff's visit to him and his purpose of visit: planning to complaint against BGSU to the GSC, and of defendant's denying plaintiff's admission. It

would not be credible or believable that defendant's Assistant Dean of the Graduate School would inform another institution (BGSU) of plaintiff's potential further complaint, but would not inform related persons (the counseling program faculty members, particularly the program coordinator, Dr. Roberts) in his own institution of plaintiff's national origin discrimination complaint issues.

(2) Additionally, during the December 2, 2010 meeting with plaintiff, when plaintiff told Mr. Elliott his past national origin education and employment discrimination complaints experiences at his previous institutions: BGSU and FIU, Mr. Elliott *immediately* recommended that plaintiff *report to the MAGS, instead of GSC*. This is evidence that Mr. Elliott *had already been aware* of the Chinese/Asian student's national/racial education and employment discrimination complaints at BGSU in the past from his meeting at the MAGS, by information provided by BGSU, but might not know the name of the complainant, as reflected by his initial phone conversation with plaintiff, which is stated in paragraph 23 (5) below. After plaintiff told Mr. Elliott about the *details* of his national origin discrimination complaints, Mr. Elliott could match the issues that he had already heard of with the particular individual that actually had complained: the person in front of him in his meeting room. At that point (during the December 2, 2010 meeting with plaintiff, with another witness present), Mr. Elliott seemed sympathetic about plaintiff's terrible experiences so he recommended that plaintiff complain to MAGS where BGSU had spread out false information about plaintiff.

23. Untrue information provided to OCR by Mr. Elliott, Assistant Dean of defendant's Graduate School:

(1) Plaintiff talked with Mr. Elliott, the Assistant Dean of defendant's Graduate School, together with a witness, Mr. Michael Hicks ("Mr. Hicks"), on December 2, 2010, *not the 22nd*, as what Mr. Elliott told OCR. Together with the fact that Mr. Elliott told OCR that plaintiff arrived unannounced while the *time and date of the meeting was picked by Mr. Elliott* on the phone prior to the meeting (*phone records available*). Mr. Elliott was trying to deny that he actually set up the appointment with plaintiff, trying to make plaintiff problematic. This attitude from Mr. Elliott per se is proof that Mr. Elliott did not want to admit plaintiff from the first place.

(2) During the December 2, 2010 meeting, after Mr. Elliott heard plaintiff tell him about his national origin education and employment discriminatory experiences at his previous two institutions, he said to plaintiff, "maybe you should go to another country and start a new life." Plaintiff said, "I think finishing school in the U.S. will be good for both of us." After defendant's denying plaintiff's admission, Mr. Elliott denied saying that to OCR. The witness, Mr. Hicks, was sitting throughout the meeting, and he provided plaintiff with the testimony that Mr. Elliott did say that to plaintiff during that meeting. Mr. Elliott's denying saying that to plaintiff is another piece of evidence that Mr. Elliott at least already did not want to admit plaintiff right after he heard plaintiff's national origin discrimination complaint experiences.

(3) During the December 2, 2010 meeting, after Mr. Elliott heard that plaintiff was trying

to raise his concerns to the GSC because defendant's Dean of Graduate School is also

a member of the GSC, Mr. Elliott immediately recommended that plaintiff complain

to the MAGS instead, and further demonstrated with his hand gestures that once they

(related people at MAGS) receive the complaint, they would check the complaint

files and see if they would impose any disciplinary actions on BGSU. However, post

defendant's denying plaintiff's admission, when asked by OCR, Mr. Elliott said that

he told complainant that the best place to pursue the grievances would be with the

universities themselves and that he did not think the Dean could help him because the

Council did not intervene into individual institutions. Those were not what he told

plaintiff during the December 2, 2010 meeting. Mr. Elliott told plaintiff that he had

worked for the Dean for many years and understood that plaintiff's purpose was to

talk to the Dean and Mr. Elliott agreed to convey the message. However, Mr. Elliott

later said to OCR that he told plaintiff that he did not think that the Dean could help

plaintiff because the GSC's role was not to directly involve in individual programs.

Together with his statement to OCR that he talked to the Dean and did not recall

specifics, the above statements that Mr. Elliott provided regarding GSC not being

able to intervene was actually what the Dean told Mr. Elliott after Mr. Elliott had told

the Dean why plaintiff would like to talk with the Dean. Mr. Elliott's this

inconsistency and concealing his talk with the Dean from OCR is proof that he tried

to deny that he conveyed plaintiff's past national origin discrimination complaint

experiences to the Dean and played a role in the admission process of plaintiff, while

actually he did play an important role: communicating with the Dean of defendant's

Graduate School about plaintiff's purpose of visit, and deciding not to admit plaintiff

because of plaintiff's national origin discrimination complaints.

(4) After plaintiff applied for the counseling program at defendant, plaintiff called Mr.

Elliott at 4:16pm central time on February 17, 2011 (a true and correct copy of phone

record is attached hereto as Exhibit I: 3 pages), and inquired Mr. Elliott about whether

the Graduate School had forwarded his files to the department for review. After

plaintiff identified himself on the phone, Mr. Elliott said firmly, "yes, I remember

you." And then he *deliberately and immediately emphasized*, "I have not talked about

your issues to the people in the counseling program." He further recommended that

plaintiff talk to Ms. Marilyn Thomas, who had been working at defendant for many

years and was a nice person, which resulted in plaintiff's actual contacting her, which

was reflected in the phone records attached as well. Post defendant's denying

plaintiff's admission, however, when asked by OCR, Mr. Elliott denied that he talked

on the phone with complainant after his December 2, 2010 meeting with plaintiff, and

that he was not involved in the admission process while *his own letter with his name*

*was and is still clearly posted on defendant's graduate admission website*. Mr.

Elliott's these actions mentioned in this section was to mislead plaintiff and OCR into

believing that the Graduate School at defendant did not inform the counseling

program of plaintiff's past national origin education and employment discrimination

complaints experiences and did not influence the counseling program on denying

plaintiff's admission due to plaintiff's those complaints mentioned, while Mr.

Elliott's self-contradictory testimony proved the opposite.

(5) Prior to the December 2, 2010 meeting, plaintiff first called the secretary in the Graduate School at defendant. Plaintiff mentioned that he would like to have a meeting with Dr. Augustine, the Dean of the Graduate School. The secretary told plaintiff that Dr. Augustine would be in D.C. having a meeting during that week when plaintiff would like to meet him, so asked if plaintiff could talk to the Assistant Dean instead and said that the Assistant Dean could also forward plaintiff's words to Dr. Augustine. The secretary transferred plaintiff's phone to Mr. Elliot, the Assistant Dean, who asked plaintiff, "What do you want to talk about? Have you talked with the International Programs Office?" Plaintiff said, "no, I am not a student at EIU, but would like to talk about my graduate studies to the Dean of your Graduate School. He is a member of the Graduate School Council (GSC), right?" Mr. Elliot said, "yes. But do you want to talk to me? I could talk to you as well. I have worked for Dr. Augustine for many years. I could talk to him about what you will talk to me." Plaintiff agreed to talk to Mr. Elliott, so *Mr. Elliott set up for the meeting* with plaintiff, which was in the afternoon of December 2, 2010. Mr. Elliott said, "ok, I will see you then." Plaintiff said, "ok. Thank you." Plaintiff then asked Mr. Hicks if he could get off work early on the day of the appointment so that he could give plaintiff a ride to make sure that plaintiff arrived at defendant on time for the appointment. Mr. Hicks agreed and the two of them arrived at the Graduate School of defendant on time. It was Benjamin Rienbolt ("Mr. Rienbolt") that welcomed them in and told plaintiff that Mr. Elliott was waiting for him. However, when asked later by OCR, Mr. Elliott said that plaintiff arrived unannounced and that he told plaintiff that he did not

think that the Dean could help and that plaintiff would be welcome to call back,
which were all completely false. Mr. Elliott's this comment to OCR is evidence that
he tried to make plaintiff appear problematic and cover up the fact that Mr. Elliott had
complete knowledge of plaintiff's national origin discrimination complaint at his
previous institution, actually fully conveyed that to the Dean and the Counseling
program Coordinator, Dr. Roberts, and had decided not to admit plaintiff because of
plaintiff's complaints.

(6) During the December 2, 2010 meeting, plaintiff told Mr. Elliott that he was planning
on applying for their counseling program even though it was at the master's level,
while Mr. Elliott later told OCR that plaintiff said that plaintiff thought that EIU was
a welcoming institution, which plaintiff never said. Plaintiff said that he knew their
counseling program was accredited.

(7) The above untrue information that Mr. Elliott provided to OCR, "did not tell plaintiff
to go to another country to start a new life," "did not talk with plaintiff after the
December 2, 2010 meeting," "did not recommend plaintiff to complain to MAGS
instead of GSC," "did not tell the Dean any specifics of the December 2, 2010
meeting," "plaintiff visited him unannounced," are obviously aimed at *denying*: (A)
Mr. Elliott did not want to admit plaintiff from the beginning (suggest going to
another country), (B) he had informed its Counseling program Coordinator, Dr.
Roberts, of plaintiff's past national origin discrimination complaints (Mr. Elliott
talked again on the phone with plaintiff after the December 2, 2010 meeting with that

particularly emphasized sentence: "*I have not talked about your issues to the people in the counseling program*" while it proved the opposite), (C) defendant (particularly the director and certain white American faculty members in the Counseling program at defendant) was aware of plaintiff's previous national origin discrimination complaints at BGSU *even prior* to plaintiff's visit to Mr. Elliott on December 2, 2010 (suggesting MAGS, instead of GSC), (D) plaintiff was polite and well and even over-qualified for its Counseling program (coming unannounced). Mr. Elliott told OCR that the admission committee was unaware of plaintiff's prior national origin discrimination complaints prior to the interview. From the important untrue information that Mr. Elliott provided to OCR, defendant's counseling program reviewing committee not only was informed of plaintiff's past national origin discrimination complaints by Mr. Elliott, but actually *had already* got to know plaintiff's national origin discrimination complaints and being terminated *even prior to plaintiff's visit to the Assistant Dean* on December 2, 2010. The plaintiff's visit simply might enable them to match the national origin discrimination complaints they had heard of earlier, via various academic networks, for example, psychology and counseling network, with the name and face of that complainant, the plaintiff.

24. (1) The two interview professors both gave plaintiff *very* low scores in *all* categories (22 categories in total). One professor gave plaintiff the *lowest* score 1 for *all* categories and the other gave plaintiff 2 (with 5 the highest) for *all* categories. After plaintiff's careful examining the evaluation sheet, plaintiff discovered that there are some areas that do not make sense or self-contradictory. For example, one testing area was "Demonstrates

openness to ideas." Plaintiff was given the *lowest score 1* out of 5. During the interview, none of the members showed opposition or shutdown to new ideas. Plaintiff emailed this professor who gave him this score, asking him to explain but never got any response as of the date of this Complaint.

(2) After denying plaintiff's admission, Dr. Conn, who gave plaintiff 1 for *all* 10 categories, *admitted* that *plaintiff's performance* "for the first exercise (the animal exercise) was *on par with everyone else*," but he still gave plaintiff 1 (the lowest score) for *all* 5 areas in this exercise. *It would not be possible that everyone else in that group all got 1 (the lowest) for this exercise*. Dr. Conn's explanation for this area was blatantly self-contradictory. This is direct evidence that Dr. Conn did treat plaintiff less favorably than others by giving plaintiff the *lowest* scores for *all* categories even though he admitted that plaintiff's performance was on par with everyone else (a true and correct copy of related documents is attached hereto as Exhibit II: 2 pages). Dr. Conn also admitted to OCR that he did recognize that plaintiff was Asian. Dr. Conn's self-contradicting evaluation also proves that the reasons he gave to OCR for giving plaintiff the lowest scores were untrue. In other words, they were pretext for his actual purpose: denying plaintiff's admission because of plaintiff's race, Asian, and national origin, Chinese, but particularly because plaintiff complained before about national origin education and employment discrimination. Dr. Conn's other behaviors, as illustrated below, also supports that he had already known of plaintiff's past national origin discrimination complaints. Plaintiff was terminated from the psychology field. Dr. Conn is in the psychology field as well. Plaintiff's degree was deprived by Dr. Julie Lengfelder,

a graduate from Southern Illinois University Carbondale, the same institution as Dr.

Conn's graduating institution. In the academia, issues like plaintiff's circulates quickly.

(3) On March 7, 2011, during this animal exercise in the interview, plaintiff said that he

believed that he himself was more like a monkey because monkeys were very *intelligent*.

When plaintiff described himself as "*intelligent*," Dr. Conn's nerve seemed to be

immediately touched, and his attention was immediately attracted as evidenced by his

eyes suddenly "flashed." Back in summer 2009, after plaintiff sent his FIU advisor the

letter disputing FIU's phony reason for terminating his doctoral career, plaintiff's BGSU

Graduate School Associate Dean praised plaintiff as "brilliant thinker;" plaintiff's mental

health counseling program advisor, Dr. Gregory Garske, at BGSU also said to plaintiff in

January 2010, "*now I know how intelligent you are!*" Dr. Conn is in psychology, too, and

he is white American. He had heard from various sources that plaintiff, the national

origin discrimination complainant, was very intelligent.

(4) After denying plaintiff's admission into defendant, *Dr. Conn mentioned to OCR* that

the second group interview activity topic was talking about something "*interesting*" about

each additional candidate, while in fact, during the interview, Dr. Conn asked each

candidate to talk about something "*positive*" about each additional candidate. Each

candidate commented on each other, which took a long time. *Positive psychology* was

what plaintiff's area of research in his *doctoral program at FIU*, and apparently positive

psychology was the doctoral program research area where plaintiff was terminated. Dr.

Conn's this false information to OCR was aimed at *breaking another link that proves* that

he had already heard of plaintiff's past national origin discrimination complaints related experiences prior to plaintiff's interview with him.

(5) After plaintiff's admission denial by defendant, when asked by OCR, Dr. Conn said that plaintiff's responses during the interview were not as "genuine" as those of other applicants, while *none of the evaluation areas were about "genuineness."* In the additional December 19, 2011 information letter that plaintiff provided to OCR during OCR's investigation, to request OCR to ask Dr. Conn's boss, Dr. Roberts, *plaintiff said* that plaintiff *did not believe* that Dr. Roberts' comments on the reasons of denying plaintiff admission *were "genuine."* Dr. Conn was taking this opportunity to please his boss, regardless of the nature of cause (in this particular case: aggravating the retaliation because of plaintiff's complaining of the protected activity), by revenging for his boss, while still admitting to OCR that he was aware of the non-discrimination policy at defendant, for what plaintiff had accused his boss of being "not genuine," by commenting on plaintiff for "not being genuine." Even assuming that plaintiff did not perform as what Dr. Conn completely liked, plaintiff should not have deserved *all 1* in all 10 categories. Dr. Conn *never* told OCR that plaintiff's answers were completely fake, either, but Dr. Conn still gave plaintiff the lowest scores for all 10 categories.

(6) The other interview professor, Dr. Larson, gave plaintiff 2 out of 5 for *all* 12 areas. Plaintiff emailed Dr. Larson for her reason(s) and has never received any response, either. Dr. Larson also did not provide with any specific examples to OCR to support her evaluation. In particular, the writing (which was evaluated by Dr. Larson) topic that

defendant assigned plaintiff's group during the interview was: "*an event that significantly changed your life and comment on that.*" In plaintiff's faxed letter to OCR on December 19, 2011, plaintiff included questions regarding this particular issue for OCR to interrogate defendant. However, defendant *did not provide any answer* to this inquiry. Plaintiff's questions in that letter were: "Did they have these topics (including the commenting on each member's positive area question) before? If yes, *when* did they *start* to have these topics? If no, under what consideration did they plan on these two topics? Who designed these two topics? Did they apply the topics for each interview groups? If no, why only to my group?" Based on these facts, defendant would like to take that interview process to freely take more intellectual property from plaintiff and to get to know more details about that terrible experience from plaintiff, to benefit themselves, rather than plaintiff, by assigning that writing topic, expecting plaintiff to write his FIU career damage issue and how he managed to survive, for example, psychologically, which was Dr. Larson and other faculty members in the Counseling department's research area. However, after finding that plaintiff did not write his career damage issue, defendant gave plaintiff a very low score, not because plaintiff's writing was poor, but because defendant did not get what it wanted to get to benefit themselves. Together with the fact that defendant had already decided not to admit plaintiff from the fist place, this action from defendant was completely evil: not only deceiving plaintiff but also trying to extract more intellectual property from him, thus double ripping off plaintiff. Dr. Larson also admitted to OCR that when conducting the interview, she recognized that plaintiff is Asian based on sight.

(7) Based on the facts and analyses from paragraph 24 (1) through (6), if plaintiff got just 2 more scores that he should have *at least* deserved for each of the 10 categories that Dr. Conn evaluated, and 1 more score for each of the 12 categories that Dr. Larson evaluated, thus reaching a score of 3 out of 5 (still only being "Average") for each of the 22 categories, although plaintiff deserved even higher scores for certain categories (for instance, the 5 categories in the animal exercise), plaintiff's interview score would have been *at least 32 higher*, which would be in proportion of the overall applicants' performance for the interview. However, plaintiff's interview score given by defendant was considerably low (only 34), as compared to the average of even all the 14 denied admission: in the mid 50s. Particularly, Dr. Conn already admitted that plaintiff's performance in 5 categories was on par with everyone else. Therefore, plaintiff's interview score was unbelievable (too low to be reasonably justified).

25. After denying plaintiff's admission, defendant stated to OCR that they admitted an Asian student in 2010. Their this *only* Asian counseling student was assigned to appear in plaintiff's group of the interview (there were a few other groups) on March 7, 2011. Defendant only had 1 Asian counseling student and was only admitted in 2010, the year shortly after plaintiff was out of his graduate career at both institutions: BGSU and FIU. This phenomenon that defendant provided OCR that they had one Asian counseling student in 2010 is more credible as *deliberately created* by defendant in response to the cross-campus Chinese national origin discrimination and retaliation complaint by plaintiff, rather than defendant's custom or history of having Asian/Chinese students in its Counseling program. Defendant's this action actually proved that it was trying to

cover something. *In fact, defendant had no such history or custom as having Asian/Chinese counseling students.*

26. (1) In April, 2011, after plaintiff got to know that he was denied admission, he called Dr. Roberts a couple of times but got no answer or calling back. Dr. Roberts later on complained to OCR that plaintiff called him several times (this attitude is completely opposite to his words to OCR that he was trying to help plaintiff "improve" and that defendant did not discriminate against plaintiff based on his race or national origin and did not retaliate for complaining of the protected activity ). Dr. Roberts also tried to make plaintiff appear problematic. This attitude towards an applicant, plaintiff, to whom he said that he would like to help "improve" showed that Dr. Roberts' *not* wanting to admit plaintiff from the first place because of plaintiff's past national origin education and employment discrimination complaints. Since Dr. Roberts did not answer the phone call or call back, plaintiff emailed him, but still got no reply. Only after plaintiff re-sent the inquiry email *two times* did Dr. Roberts email back with a very *vague answer*: their spots were limited; plaintiff's three areas were not as competitive as others admitted. After plaintiff asked Dr. Roberts to be more specific about the reasons he gave, Dr. Roberts emailed back, "I can't be more specific."

(2) During OCR's investigations, Dr. Roberts provided to OCR that his reason for telling the applicant his "weaker" areas, after plaintiff asked, was to help plaintiff "improve." However, nobody had challenged Dr. Roberts for *whether* he should gave those reasons, but rather, plaintiff asked him *how* plaintiff was not as strong as others in those areas that

Dr. Roberts pointed out (for example, Dr. Roberts did not provide writing samples scored higher, lower than, or similar to that of plaintiff's to demonstrate). When plaintiff actually asked Dr. Roberts to address plaintiff's this actual concern of *how* Dr. Roberts reached that conclusion, Dr. Roberts said *very dismissively* that he "can't be more specific." Without knowing the actual reason (specifics, especially after plaintiff asked him) how could plaintiff improve? In reality, the rejection reason that Dr. Roberts provided to plaintiff ("limited spots;" "not as competitive as others") was *exactly the same* as what FIU's advisor, Dr. William Kurtines, gave to plaintiff to reject his re-admission in 2009 ("limited spots;" "records not as strong"). "What areas to improve" this concept is another sentence mentioned in a very important dispute letter plaintiff sent to his FIU advisor in October, 2009, after being terminated. Obviously, Dr. Roberts' explanations mentioned in this section proves that he not only was informed of plaintiff's past national origin discrimination experiences prior to the admission process, but also took this admission chance to further intentionally harm plaintiff again, career and mentally, with the same words that significantly harmed plaintiff mentally in the past, which Dr. Roberts, a professor in psychology, clearly understood. In other words, any student who has a high expectation of getting re-admitted will remember the rejection letter and its wording forever, even though it is a disastrous experience, because it signifies that the student's career in that institution is completely terminated. Dr. Roberts' this premeditated action against plaintiff was obviously aimed at aggravate the discrimination and vividly expressed his hate towards plaintiff for filing the national origin discrimination complaints.

(3) Plaintiff's Graduate Record Examination ("GRE;" the Graduate School admission standardized test) *writing score* was 5.0 out of 6.0, which is described by GRE official site as "Provides generally thoughtful analysis of complex ideas; develops and supports main points with logically sound reasons and/or well-chosen examples; is generally focused and well organized; uses sentence variety and vocabulary to convey meaning clearly; demonstrates good control of sentence structure and usage, but may have minor errors that do not interfere with meaning." Plaintiff's this score was viewed by Dr. Roberts, which was proved by plaintiff's evaluation sheet provided by defendant to OCR. Dr. Roberts was also forwarded plaintiff's past *graduate* (*master's and doctoral in psychology*) transcripts. Plaintiff was *better prepared* for the Counseling program than most other applicants who had no graduate school experience at all. However, plaintiff still received only 10 out of 30 for his *writing sample*, which was categorized as "Poor" by defendant. It would not be believable that plaintiff achieved 5 out of 6 in his GRE writing test, which was a much more complicated and stringent academic writing test, then pursued 3 years of graduate studies, and then plaintiff's writing became even worse (a true and correct copy of plaintiff's related documents is attached as Exhibit III: 3 pages). In fact, both plaintiff's academic advisor (prior to committing the conspired fraud), and plaintiff's law professor at BGSU highly praised for plaintiff's academic writing abilities. Defendant's evaluation of plaintiff's writing ability was completely deviating from plaintiff's consistent good performance in writing, and extremely problematic. In fact, plaintiff's graduate career started to get damaged just due to his final project (a *writing project*), which was *forced* to stop due to the conspired fraud committed by three faculty members (Dr. Philip Xie, Dr. Julie Lengfelder, and Dr.

Bonnie Berger) at BGSU, which was part of the ongoing national origin discrimination complaint. This is a big scandal in the academia. Defendant deliberately lowered plaintiff's *writing score* for its admission tests was premeditated, to assist BGSU in covering up the fraud, by making plaintiff *appear* unqualified *for writing*, thus aggravating the brutality of the white collar criminality, while a more standardized and objective score, the GRE writing score from plaintiff, definitely suggests the otherwise, so do plaintiff's other professional writing evaluations. Therefore, plaintiff should have deserved at least 20 (Average writing sample) for the Writing Sample score, instead of 10.

(4) Prior to applying for the Counseling Master's program at defendant, plaintiff was *already admitted* into the Counseling Master's program at BGSU, *and* Developmental Psychology Doctoral program at FIU *with merit-based funding since plaintiff was among its top applicants*, with 1.5 years of extremely closely related experience in the counseling field. However, defendant gave plaintiff 5 (low quality &/or quantity of experience) out of 15 of the Experience score. Based on the self-introductions of interviewees, plaintiff's related experience was more than that of the majority of other applicants. Most applicants did not have any counseling experience at all. Some were even from a completely different area, such as physics. Plaintiff should have got 10 (Medium quality &/or quantity of experience) in this area, instead of 5.

(5) Together with the at least 32 more scores that plaintiff should have got for the interview, as reflected in paragraph 24 above, plaintiff's total score should have been at least 47 (32+10+5) more. According to the admission records provided to OCR by

defendant, plaintiff was 38 (139-101) scores short of getting admitted. However, according to the above information in this Complaint, plaintiff should have got *at least* 47 more scores, which would have enabled him to get admitted and proceed to get merit-based funding, which he was eligible as well. Particularly, the psychology and counseling field nowadays emphasizes diversity significantly. Faculty members in defendant's Counseling program were aware of that, especially defendant's counseling program was accredited. That plaintiff was defendant's only Asian and Chinese applicant was even a great value to its learning environment. Defendant should have immediately admitted plaintiff not only because plaintiff was qualified, in fact well qualified, but also of his minority status, which would be consistent with the value of psychology and counseling. However, plaintiff was given unreasonably low scores and denied admission by defendant.

27. Shortly after defendant denied plaintiff's admission and plaintiff discovered evidence to make plaintiff believe that defendant discriminated against plaintiff based on his race, Asian, *and* his national origin, Chinese, and in particular, retaliated against him because plaintiff complained about the ongoing national origin education and employment discrimination at BGSU, plaintiff, just gradually recovering from his depression and anxiety caused by the discrimination and retaliation actions from his previous two institutions, BGSU and FIU, started to have to receive counseling service again, in which he was diagnosed to have depression and anxiety again. Plaintiff had to again receive medical attention as well.

28. After OCR completed its investigation of defendant, plaintiff called defendant's Graduate School to inquiry about Mr. Elliott's appointment with plaintiff issue back on December 2, 2010, which was falsely stated by Mr. Elliott to OCR. This time, the previous friendly male secretary, Mr. Rienbolt, became completely the opposite: very hostile and unreasonable, and said to plaintiff impatiently and extremely defensive, "what information do you need?! You don't even know what you are talking about..." while it was Mr. Rienbolt who did not want to provide plaintiff with the basic assistance by letting him know when the female secretary would be available, as that was who plaintiff was trying to reach. Apparently, defendant's administration, after OCR's investigation, had instructed related personnel (the Graduate School staff, the interview faculty members, etc) at defendant against assisting plaintiff in his basic inquiries, even though defendant was well aware that plaintiff had filed the national origin discrimination in education and retaliation complaint to OCR and that a potential lawsuit against defendant was pending. Had defendant not provided with OCR with untrue, inconsistent, and problematic information during OCR's investigation, and had defendant not discriminated against plaintiff based on his race and national origin and in retaliation of plaintiff's complaining of ongoing national origin discrimination in education and employment at BGSU, defendant would have treated plaintiff as what it had told OCR, instead of being hostile and preventing plaintiff from discovering more truth regarding this case. Plainly speaking, if a person did not steal anything, there was no reason for him/her to hide.

**COUNT ONE**

**Title VI: Racial and National Origin Discrimination in Education**

29. Plaintiff re-alleges and restates the allegations contained in paragraphs 1-28 above, as if fully set forth herein.

30. Plaintiff, Junhao Su, was born in the People's Republic of China. Plaintiff is Asian, and of Chinese national origin. Therefore, plaintiff was/is a member of the protected class.

31. Plaintiff applied for, and was eligible for, a federally assisted program, specifically the Master in Clinical Counseling program at defendant, that was accepting applicants (Compl.: 9, 10, 24 & 26 (may not be exclusive)).

32. Despite plaintiff's eligibility, he was rejected admission (Compl.: 12 (may not be exclusive)).

33. The defendant admitted 23 applicants of all non-Asian Americans, as stated in OCR's findings.

34. Even though the defendant articulated nondiscriminatory explanation for the alleged discriminatory action, to plaintiff as well as to OCR, plaintiff discovered that the record contains sufficient evidence to establish that the defendant's stated reason was a pretext for discrimination. In other words, the reason articulated by the defendant was not the true reason for the challenged action, and that the real reason was discrimination based on

plaintiff's race (Asian) and his national origin (Chinese) (Compl.: 9, 10, 13, 24, 26, & 28 (may not be exclusive)).

35. The evidence provided in this Complaint also establishes that a pattern of discrimination based on race (Asian) and national origin (Chinese) was the defendant's "standard operating procedure, the regular rather than the unusual practice." For example, defendant's Counseling program only deliberately admitting an Asian student in 2010, when plaintiff's cross-campus ongoing national origin (Chinese) discrimination complaint rose to a high point: forced to leave both institutions without getting any degree, to mislead others into believing that defendant did not discriminate against Asian or Chinese in providing its education. However, this deliberate act from defendant actually proved the other way around (Compl.: 25 (may not be exclusive)).

36. As a result of defendant's intentional discrimination in education based on plaintiff's race (Asian) and national origin (Chinese), plaintiff is entitled to injunctive relief and damages for both pecuniary and non-pecuniary injuries.

**COUNT TWO**

**Title VI: Retaliation**

37. Plaintiff re-alleges and restates the allegations contained in paragraphs 1-36 above, as if fully set forth herein.

38. Plaintiff engaged in a protected activity: Specifically, in February, 2008, plaintiff filed the ongoing national origin employment *and* education discrimination complaint to the Office of Equity and Diversity of his previous institution, BGSU, in Ohio. BGSU acknowledged plaintiff's this action to EEOC on its December 16, 2011 letter to EEOC. The EEOC charge number for national origin employment discrimination against BGSU is 471-2012-00034.

39. The defendant knew of the plaintiff's protected activity: On December 2, 2010, plaintiff directly talked about plaintiff's engaging in that protected activity to Mr. Elliott of defendant in person, with a witness present. In addition, as stated in this Complaint, various people at defendant had already known of plaintiff's engaging in that activity and plaintiff's subsequent experiences: career termination at both BGSU and plaintiff's second institution, FIU, even prior to plaintiff's talk with Mr. Elliott, although Mr. Elliott told at least Dr. Roberts of plaintiff's past national origin discrimination complaint experiences as well (Compl.: 9 - 11, 13, 19 - 26 (may not be exclusive)).

40. The defendant not only denied plaintiff's admission into its Clinical Counseling Master's program that plaintiff applied for and eligible for, but also took that chance to further intentionally inflict emotional pain upon plaintiff by deliberately and unreasonably degrading plaintiff's *writing abilities* to aggravate the *brutality of the white collar criminality*, specifically the conspired fraud, from the faculty members at BGSU that caused plaintiff's final writing project to cease, which lead to the deprivation of plaintiff's degree at BGSU, and by deliberately using *exactly the same* vague denial

reason as *FIU used* to purposefully refresh plaintiff's most painful memories from his

denial of re-admission into FIU in 2009. Defendant also took this chance to intentionally

devise the scheme to cause plaintiff to spend money, time, and efforts on this admission

process while defendant had already decided not to admit plaintiff from the first place

(Compl.: 9 – 13, 19 – 24, & 26 (may not be exclusive)).

41. There was a causal connection between plaintiff's protected activity and the defendant's

adverse actions: Plaintiff directly told Mr. Elliott about plaintiff's engaging in the

protected activity just prior to submitting his application package to defendant. Only 3

days after the on-campus interview, defendant already issued the letter to plaintiff that

defendant was denied admission, given the number of over 60 invited applicants,

evaluating of over 60 writings, and faculty members' busy schedule (not just for the

admission). In addition, based on the attitudes and actions of various people at defendant

towards plaintiff, as stated throughout this Complaint, defendant was definitely not happy

that plaintiff complained about the protected activity, particularly, those people at

defendant were white Americans while plaintiff's complaints were about national origin

discrimination (Compl.: 9 – 13, 19 – 24, 26, & 28 (may not be exclusive)).

42. The defendant articulated "legitimate non-discriminatory reason" for the retaliatory

action. However, the defendant's proffered reason is pretextual and that the defendant's

actual reason was retaliation because plaintiff complained of national origin education

and employment discrimination at his previous institution, BGSU (Compl.: 9 - 11, 13, 19

– 26, & 28 (may not be exclusive)).

43. As a result of defendant's intentional retaliation because of plaintiff's complaining of national origin education and employment discrimination in his previous institution, BGSU, plaintiff is entitled to injunctive relief and damages for both pecuniary and non-pecuniary injuries.

## COUNT THREE

### Intentional Infliction of Emotional Distress

44. Plaintiff re-alleges and restates the allegations contained in paragraphs 1-43 above, as if fully set forth herein.

45. Defendant's conduct was extreme and outrageous: defendant had already known of plaintiff's past national origin education and employment discrimination complaints and his subsequent career termination experiences, both directly from plaintiff and from other sources, and therefore, had already decided not to admit plaintiff before the interview, but still intentionally concealed this intention from plaintiff and wasted plaintiff's time, money, and efforts in this admission process, which lasted for more than half a year, which occurs only *once a year* if student would need merit-based funding from the institution (which was plaintiff's situation and defendant was aware of that; it means that if plaintiff was denied admission, he had to apply after a whole year), and which defendant utilized solely for the purpose of making itself *appear* fair *on the face* in selecting applicants; defendant, knowing that plaintiff placed a high trust on it because

plaintiff revealed to defendant that he knew its Counseling program was accredited and because defendant was a nationally accredited institution as well, instead abused this position to further aggravate the discrimination by further retaliating against plaintiff; importantly, defendant deliberately targeted plaintiff's most painful areas, such as the deprivation of degree due to plaintiff's *writing project* and the denial of his re-admission by FIU in 2009, by further refreshing plaintiff's memories of those most painful areas via aggravating the *same* harms (unreasonably *degrading* plaintiff's *writing abilities*, using the *exact vague reason* for denying admission) as BGSU and FIU imposed on plaintiff to further facilitate the white collar criminality against plaintiff (Compl.: 9 - 13, 19 – 26, & 28 (may not be exclusive)).

46.  Defendant not only intended to inflict severe emotional distress on plaintiff, but also clearly knew that there was a high probability that defendant's conduct would cause severe emotional distress: as stated in the previous paragraph, defendant's harm to plaintiff was pre-meditated and deliberately targeting plaintiff's most painful areas; as educators who have worked for over 10 years in the academia, various people at defendant clearly knew that plaintiff had suffered from severe pains, particularly plaintiff, a student, was from a completely different culture whose career in both institutions had been severely damaged due to the sensational national origin discrimination and retaliation, which also involved criminal activities, such as the conspired fraud, resulting in plaintiff's being unable to get any of his four degrees that he was working towards; that education is related to *anyone's lifetime*, and plaintiff's current situation already told defendant that the rest of plaintiff's life might be completely damaged by BGSU and FIU;

that admitting plaintiff, even though defendant clearly knew that plaintiff was not only

eligible for admission but even over-qualified for admission, especially as a minority

highly valued in the Counseling field, would definitely help him further recover from the

pains that he had suffered; and that, on the contrary, denying his admission would

absolutely aggravate the harm to plaintiff, which was even more obvious to experts in

psychology and counseling (the faculty members in the Counseling program at

defendant), but defendant still chose to deny plaintiff's admission, to not only impose

more emotional distress to plaintiff but also to use its this action to obviously protest

against Title VI; in addition, plaintiff's psychiatric treatment due to the national origin

discrimination and retaliation was done in the State of Illinois in April, 2010, and

defendant had knowledge of that (Compl.: 9 - 13, 19 – 26, & 28 (may not be exclusive)).


47. Defendant's conduct actually caused severe emotional distress to plaintiff: as a result of

defendant's intentional discrimination and retaliation against plaintiff and defendant's

deliberate targeting plaintiff's most painful areas to repeat the harms, plaintiff had to once

again start mental health treatment and even medical attention (Compl.: 27).


48. As a result of defendant's intentional infliction of emotional distress upon plaintiff,

plaintiff is entitled to at least compensatory damages.


## COUNT FOUR

### Illinois Consumer Fraud and Deceptive Business Practices Act

49. Plaintiff re-alleges and restates the allegations contained in paragraphs 1-48 above, as if fully set forth herein.

50. Defendant had already decided not to admit plaintiff, before the March, 2011 on-campus interview, but still instructed its related employees to jointly set up this "show" (actions from defendant throughout the admission process) to plaintiff, pretending to be fair in its admission process, and made plaintiff falsely believe that he might still be admitted by defendant, as evidenced by defendant's still accepting plaintiff's on-campus job applications but nobody told plaintiff's the truth, and by defendant's sending plaintiff invitation for the on-campus interview (Compl.: 9 - 13, 19 – 26, & 28 (may not be exclusive)).

51. Knowing that plaintiff was from a completely different culture so not completely familiar with the local culture, and knowing that plaintiff appreciated that defendant's program was accredited and that defendant was an accredited institution as well, defendant pretended to make plaintiff falsely believe that it would evaluate plaintiff's admission materials fairly. Knowing that plaintiff was determined to try to get admitted by defendant's Counseling program, defendant, even though having already decided not to admit plaintiff, still invited plaintiff to the on-campus interview (Compl.: 9 - 11, 19 – 26, & 28 (may not be exclusive)).

52. Defendant's acts stated in the previous two paragraphs occurred in the course of conduct involving defendant's selling its education product (Master's degree in Counseling program) to its potential customers, including plaintiff, which occurred in 2011.

53. Defendant took advantage of the facts that plaintiff was not completely familiar with the local culture, that plaintiff placed his trust in the accredited program that defendant offered and defendant as a whole, and that defendant published on its website that defendant respected Title VI, making minority students, potential or current, feel safe at defendant, to actually mislead plaintiff into believing that it would not be possible that defendant would actually act contrary to what it publicly advertised itself, in regard to Title VI.

54. As a result of defendant's acts stated in this COUNT, plaintiff not only wasted his traveling expenses to and from the on-campus interview, another year of getting into a graduate program, but also experienced another round of intentional infliction of emotional distress from defendant, and wasted valuable time pursuing his previous legal claims against BGSU and FIU, which could have been avoided if defendant had immediately told plaintiff, during and/or after the December 2, 2010 meeting with Mr. Elliott, about the truth and related information that defendant had heard of about plaintiff, to enable plaintiff to quickly head towards the right direction to achieve the justice that he deserved, instead of wasting another several months on this scheme that defendant created.

55. As a result of defendant's this willful and intentional fraudulent and deceptive act done with evil motive and recklessly indifferent to plaintiff's rights, plaintiff is entitled to injunctive relief and damages for both pecuniary and non-pecuniary injuries.

## COUNT FIVE

### Breach of Fiduciary Duties

56. Plaintiff re-alleges and restates the allegations contained in paragraphs 1-55 above, as if fully set forth herein.

57. Plaintiff applied for defendant's Master's in Counseling program fall 2011 admission. The program was and is still accredited by Council on Accreditation of Counseling and Related Programs (CACREP). Defendant was and is still a nationally accredited institution as well. Defendant published on its website clearly that it respected Title VI. Both the program and the institution as a whole enjoyed and still enjoy a high reputation. The people within defendant with whom plaintiff had had business contacts (Mr. Elliott, Dr. Roberts, Dr. Conn, etc) had all worked in the academia for over 10 years, most of whom had doctoral degrees and all had and have good reputation in the field. Plaintiff had a Bachelor's degree and was relatively new to the local society. Plaintiff trusted in and relied upon defendant. A fiduciary duty existed between plaintiff and defendant.

58. Defendant was responsible for evaluating plaintiff's admission materials fairly, without misleading or cheating on plaintiff, throughout the admission process, as a result of the defendant's fiduciary position.

59. Defendant, however, knowing that it had already decided not to admit plaintiff, still not only falsely misled plaintiff, through its deceptive and fraudulent conducts as stated in the previous paragraphs on this Complaint, into believing that it might still admit plaintiff, but also took the admission opportunity to intentionally inflicting emotional distress on plaintiff, and to evaluate plaintiff's application materials with obvious bias to further harm plaintiff's career, and further furnished OCR with false, inconsistent, and misleading information to further deny plaintiff's rights. As a result of that, the fiduciary duty was breached by defendant.

60. Defendant's breach of its fiduciary duty proximately caused plaintiff not only to have wasted his traveling expenses to and from the on-campus interview, another year of getting into a graduate program, but also to have experienced another round of intentional infliction of emotional distress from defendant, and wasted valuable time pursuing his previous legal claims against BGSU and FIU, which could have been avoided if defendant had immediately told plaintiff, during and/or after the December 2, 2010 meeting with Mr. Elliott, about the truth and related information that defendant had heard of about plaintiff, to enable plaintiff to quickly head towards the right direction to achieve the justice that he deserved, instead of wasting another several months on the scheme that defendant had set up.

61. As a result of defendant's breach of its fiduciary duty, plaintiff is entitled to damages for both pecuniary and non-pecuniary injuries.

## COUNT SIX

### Negligence

62. Plaintiff re-alleges and restates the allegations contained in paragraphs 1-61 above, as if fully set forth herein.

63. Plaintiff applied for defendant's Master's in Counseling program fall 2011 admission. The program was and is still accredited by Council on Accreditation of Counseling and Related Programs (CACREP). Defendant was and is still a nationally accredited institution as well. Defendant published on its website that it respected Title VI. Defendant had the duty to evaluate plaintiff's admission materials fairly, without misleading or cheating on plaintiff, throughout the admission process.

64. Defendant, however, knowing that it had already decided not to admit plaintiff, still not only falsely misled plaintiff, through its deceptive and fraudulent conducts as stated in the previous paragraphs on this Complaint, into believing that it might still admit plaintiff, but also took the admission opportunity to intentionally inflicting emotional distress on plaintiff, and to evaluate plaintiff's application materials with obvious bias to further harm plaintiff's career, and further furnished OCR with false, inconsistent, and

misleading information to further deny plaintiff's rights. As a result of that, the aforementioned duty was breached by defendant.

65. Defendant's breach of its aforementioned duty proximately caused plaintiff not only to have wasted his traveling expenses to and from the on-campus interview, another year of getting into a graduate program, but also to have experienced another round of intentional infliction of emotional distress from defendant, and wasted valuable time pursuing his previous legal claims against BGSU and FIU, which could have been avoided if defendant had immediately told plaintiff, during and/or after the December 2, 2010 meeting with Mr. Elliott, about the truth and related information that defendant had heard of about plaintiff, to enable plaintiff to quickly head towards the right direction to achieve the justice that he deserved, instead of wasting another several months on the scheme that defendant had set up.

66. As a result of defendant's willful, intentional, and wanton breach of its aforementioned duty, plaintiff is entitled to damages for both pecuniary and non-pecuniary injuries.

WHEREFORE, plaintiff respectfully prays this Court to advance this case on the docket; order a speedy hearing at the earliest practicable date; and to cause this case to be in every way expedited and upon such hearing to:

(1) Issue a declaratory judgment that defendant's acts, policies, practices and procedures complained of herein violated plaintiff's rights as secured by Title VI; and

(2) Issue an injunction ordering defendant to: (A) stop blackballing plaintiff immediately, (B) provide plaintiff with a complete set of documents containing all information relating to plaintiff that defendant (from at least Mr. Elliott, Dr. Roberts, and Dr. Conn) has obtained from various sources (from whom, when, where, content, etc), (C) seriously consider filing a cross-claim against whoever that had disseminated negatively untrue and/or misleading information about plaintiff, which caused, or in part, defendant to be sued by plaintiff, and (D) issue plaintiff a letter stating plaintiff's various merits that it had actually noticed, and stating that defendant feels shameful that, similar to abusing minors, it has taken advantage of plaintiff who was from a completely different culture thus having to go through a long period of cultural shock, which not a single person on earth could bypass, but who was/is so talented and possessed/possesses a strong passion for American advanced education.

(3) Retain jurisdiction over this action to assure full compliance with the orders of the court and with applicable law and require defendant to file such reports as the court deems necessary to evaluate compliance; and

(4) Award plaintiff compensatory and punitive damages; and

(5) Grant plaintiff reasonable attorney fees; and

(6) Grant such additional relief as the court deems just and proper; and

(7) Grant plaintiff a jury trial upon those issues triable by jury.

Plaintiff also respectfully prays that, due to defendant's intentional, willful, and wanton acts as stated in this Complaint against plaintiff, and due to that defendant was, prior to processing plaintiff's application for admission, furnished with negatively untrue and misleading information about plaintiff by malicious third parties, even though, similar to FIU's case, defendant ultimately possessed its right to make its own decision as to whether to further harm plaintiff or not regardless of any third party's influence, the prayer amount as requested in (4) to (6) in this Prayer for Relief section fall into the medium range of no less than US $500,000, which shall be utilized by plaintiff not only to compensate for plaintiff's losses, but also to benefit the innocently injured persons in the state of Illinois whose experience was similar to or the same as that of plaintiff but who do not have to be minorities, thus achieving the goal of breaking certain racists' stereotyped evil mentality that minorities suing for discrimination "just want to get onto the express," letting such offenders and/or the ill-educated realize the victims' significant pains caused by exactly the evil racists, thus appreciating the necessity of exercising diligent care to treat such complaints on a case-by-case basis without pre-determined bias, *and* the goal of shifting wealth from the evil to the good, which is consistent with the value of the justice system.


Respectfully submitted,

Junhao Su (Pro Se)

c/o Michael H.

P.O.Box 1261

Mt. Vernon, IL 62864